**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Brian Scott MADDOX, Defendant–
Appellee.**

No. 93–5591.

United States Court of Appeals,
Fourth Circuit.

Argued April 14, 1994.

Decided Feb. 21, 1995.

---

**ARGUED:** David J. Cortes, Asst. U.S. Atty., Raleigh, NC, for appellant. William Webb Plyler, McMillan, Kinzey & Smith, Raleigh, NC, for appellee. **ON BRIEF:** James R. Dedrick, U.S. Atty., Raleigh, NC, for appellant.

Before RUSSELL, Circuit Judge, BUTZNER, Senior Circuit Judge, and DOUMAR, United States District Judge for the Eastern District of Virginia, sitting by designation.

Reversed in part, vacated in part, and remanded by published opinion. Judge RUSSELL wrote the opinion, in which Senior Judge BUTZNER and Judge DOUMAR joined.

## OPINION

DONALD RUSSELL, Circuit Judge:

The government appeals the district court's sentencing of Defendant Brian Scott Maddox for charges arising from his armed robbery of a bank. Specifically, the government challenges the district court's downward departure from both a statutory mandatory minimum sentence and the Sentencing Guidelines range based upon the grounds of: (1) substantial assistance under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1; (2) extraordinary vulnerability to victimization in prison; and (3) extraordinary family ties under U.S.S.G. § 5H1.6. We reverse in part, vacate in part, and remand.

### I.

On January 25, 1991, Defendant Maddox and Larry Randall Bullock robbed a small branch of the United Carolina Bank in Raleigh, North Carolina. Bullock brandished a pistol while Maddox shouted at bank tellers to give him money from the teller drawers. They escaped by car to Franklinton, North Carolina, where they divided the $3,544.00 they had stolen.

On July 23, 1991, a prisoner in the Vance County Jail told Detective William Gardner of the Raleigh Police Department that Maddox and Bullock had robbed the bank. On July 25, 1991, Detective Gardner provided this information to FBI Special Agent Gregory Baker, who spoke with relatives of Bullock. Bullock's brother Barney identified Maddox and Bullock in the bank's surveillance photographs. Barney also informed Agent Baker that Maddox had admitted robbing the bank about two weeks after the robbery.

Upon learning that the FBI was looking for him, Maddox turned himself in to the Vance County Sheriff's Department on July 25, 1991. He confessed to the robbery, identified himself and Bullock in the surveillance photographs, and informed the FBI that Barney had "cased out" the bank and shared in the loot. Maddox also helped FBI agents search for Bullock, who had heard of his pending arrest and reportedly was hiding in the woods. Agent Baker apprehended Bullock the next day and obtained his confession.

On August 13, 1991, Maddox and Bullock were both indicted for conspiracy to commit armed bank robbery (Count One), armed bank robbery (Count Two), and use of a firearm during a crime of violence (Count Three). During pretrial negotiations, the United States Attorney for the Eastern District of North Carolina made the same plea offer to each defendant: the government would consider moving for downward departure on the basis of substantial assistance if the defendant would plead guilty to Counts Two and Three, and testify against the other defendant.[1] Thus, the government did not care which, if either, defendant received the downward departure motion; but the government would only consider making the motion if one defendant pleaded guilty and actually testified against the other who pleaded not guilty. If both had pleaded guilty, then neither would have qualified for the downward departure motion because no testimony would have been needed.[2]

As of late September 1991, neither defendant had accepted the government's offer, but both had expressed interest in testifying against the other. Maddox never accepted the government's offer. On October 1, 1991,

1. At oral argument before this Court, the government disputed whether actual testimony was required to qualify for the substantial assistance motion. The government contended that the terms of the proposed plea agreement were never reduced to writing because Maddox rejected the offer and fulfilled neither condition. Bullock's written plea agreement required that he testify "whenever called upon by the Government." Joint Appendix (JA) at 351. The district court, however, found that the government's offer to Maddox required actual testimony that was impossible once Bullock pleaded guilty. We find that the district court's factual determination was not clearly erroneous, particularly since the record shows that the government conceded this point during the November 5, 1992, sentencing hearing. JA at 278, 280.

2. This scenario was unlikely, however, because once one defendant learned that the other had plead guilty, he could no longer receive the downward departure motion and still faced a mandatory five-year sentence for the firearm charge. Therefore, the "late" defendant had nothing to lose by proceeding to trial.

Bullock accepted the offer by signing a plea agreement. Pursuant to the agreement, he pleaded guilty to Counts Two and Three on October 7, 1991, and the government dismissed Count One. Later that day, Maddox pleaded guilty to Counts One and Two. The next day, he went to trial on Count Three, the firearm charge. With the help of Bullock's testimony,[3] the jury convicted Maddox.

At Maddox's first sentencing hearing on February 3, 1992, the district court adopted the factual findings and Sentencing Guidelines applications in the presentence report. The court found that Maddox's total offense level was 18 and his criminal history was Category I. The court also found that Counts One and Two imposed an imprisonment range of 27 to 33 months and that Count Three required a mandatory five-year term of imprisonment to run consecutively with the term imposed on the other counts. Maddox raised questions concerning the extent of his assistance to the government and the allegedly improper rationale behind the government's decision to refuse to file a downward departure motion for him. The court ordered another hearing to explore these issues further.

When the court invited Maddox to speak in his own behalf, he began crying after only a few words. The court instructed counsel for Maddox and the government to submit briefs concerning the possibility of a downward departure based upon Maddox's mental condition. At a second sentencing hearing on March 2, 1992, the court ordered that Maddox undergo a psychological study to determine whether he was suffering from a mental disease or defect, and whether his condition would have made him more susceptible to coercion or duress by another person during the robbery. Maddox was examined by two clinical psychologists, Dr. C. Keith Conners and Dr. George Fowles. On September 24, 1992, at the third sentencing hearing, the court determined that, on the basis of the testimony of the psychologists, Maddox was not entitled to a departure because of coercion or diminished capacity.

On November 5, 1992, the court conducted a fourth sentencing hearing to determine whether Maddox was entitled to a downward departure for providing substantial assistance. On April 13, 1993, the court issued an order finding that Maddox had rendered substantial assistance and that the government had violated his constitutional rights by failing to move for downward departure. The court, sua sponte, also directed the parties to brief the question of whether Maddox should receive a downward departure as "an especially vulnerable person as discussed in *United States v. Lara*, 905 F.2d 599, 603 (2d Cir.1990), and other recent cases." JA at 391.

On July 6, 1993, the district court conducted a fifth sentencing hearing. Two experts, Dr. Sally Johnson and Dr. Fowles, testified that Maddox was not extraordinarily vulnerable, relative to the general federal prison population, to violence or physical abuse. Dr. Johnson, the associate warden for health services at the federal prison in Butner, North Carolina, concluded that Maddox's borderline intelligence and dependent personality disorder are not unusual in the federal prison population, which has many people like Maddox in it. Dr. Fowles confirmed Dr. Johnson's findings and added that Maddox did not appear to be especially frail or effeminate.[4]

The only contrary evidence offered by Maddox was a one-page letter from Dr. Conners stating that "[i]ndividuals like Brian are particularly vulnerable to aggression and mistreatment from others." JA at 399. The government objected to this letter because Dr. Conners had shown no prior experience in dealing with prisoners and had not previously testified concerning the mental state of a criminal defendant. In fact, there was no

---

3. The district court noted that polygraph tests conducted after the trial indicated that Bullock had committed perjury by lying about Barney's involvement in the robbery. The government concluded that Bullock had testified untruthfully and decided not to move for a downward depar-

ture of his sentence. Had Bullock testified truthfully, he probably would have received the substantial assistance motion. *See* JA at 379 n. 1.

4. The presentence report described Maddox as 5' 10" tall, and weighing 155 lbs. JA at 25.

evidence that Dr. Conners had ever been inside a federal prison.

In an order issued on July 22, 1993, the district court found that Maddox was entitled to departure based on his substantial assistance, as determined earlier, and on the additional ground of extraordinary vulnerability. Furthermore, without advance notice to the government, the court found sua sponte that Maddox also was entitled to a downward departure because of his extraordinary family ties. The court noted that one of Maddox's sisters is mentally retarded and suffers from a seizure disorder. The court found that the sister related well to Maddox, who "is of invaluable assistance in helping to care for her." JA at 397. The court also found that Maddox provides relief to his mother and is "crucial to the stability of his family." JA at 397.

The district court sentenced Maddox to five years probation, notwithstanding the five-year mandatory minimum sentence required by his conviction for using a firearm during a crime of violence under 18 U.S.C. § 924(c).[5]

## II.

■ The government challenges the district court's granting of Maddox's motion for downward departure based on substantial assistance despite the government's refusal to move for downward departure under either 18 U.S.C. § 3553(e) or U.S.S.G. § 5K1.1. This Court has held that absent a motion by the government, district courts cannot consider whether a defendant is entitled to a downward departure from the Sentencing Guidelines range based on substantial assistance. *United States v. Francois*, 889 F.2d 1341, 1344–45 (4th Cir.1989), *cert. denied*, 494 U.S. 1085, 110 S.Ct. 1822, 108 L.Ed.2d 951

(1990). In *Wade v. United States*, 504 U.S. 181, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992), the Supreme Court carved out two exceptions to the virtually unreviewable decision-making power of prosecutors regarding such motions. A district court may review the government's refusal to file a substantial assistance motion, and grant a remedy, if the court finds that the refusal: (1) is based on an unconstitutional motive; or (2) is not rationally related to a legitimate government objective. *Id.* at 184–87, 112 S.Ct. at 1843–44.[6]

■ The district court found as a matter of law that the government's refusal to move for downward departure for Maddox was not rationally related to a legitimate government objective. The court agreed with Maddox that the government abdicated its decision-making power by arbitrarily allowing the defendants themselves to "choose" which one could receive the downward departure motion. The court found that the government's decision "was dictated not by a rational and considered evaluation of defendants' degree of assistance, but was instead a toss-up with the precision of a basketball tip-off." JA at 389. We disagree.

This case differs in two respects from the typical case in which the government refuses to make a downward departure motion. First, the government and Maddox never entered into a written plea agreement from which the district court could adduce a government breach. In fact, Maddox does not contend that the government breached an oral or written agreement to move for a downward departure or that such an agreement was even reached by the parties. In a case decided before *Wade*, this Court noted that:

> In the absence of an agreement requiring the government to file the motion, the

---

5. The district court concluded that:

> To send this defendant to prison would advance no worthy societal goal and would serve only to consign Maddox to years of destructive influences and utter despair. The court regrets that its obligation to craft an appropriate sentence for Maddox implicates such extensive procedural maneuverings on all sides. Still, the court has, as it must, proceeded through all necessary hoops to justify its departure from

> the Guidelines. The Guidelines do not fit this case, and a probationary sentence does.
> JA at 398.

6. *Wade* also requires that a defendant must make a "substantial threshold showing" in support of his claim. *Wade*, 504 U.S. at 186–87, 112 S.Ct. at 1844. The district court found that Maddox had satisfied this burden. JA at 383. Because the government did not challenge this ruling on appeal, we need not address the issue.

defendant has no right to demand that one be filed. Moreover, in these circumstances, the court would have no right to demand, and the government would be under no obligation to offer, any explanation why the government made the prosecutorial decision not to file the motion. *United States v. Daniels*, 929 F.2d 128, 131 (4th Cir.), *cert. denied*, 502 U.S. 870, 112 S.Ct. 201, 116 L.Ed.2d 161 (1991). In light of the exceptions noted in *Wade*, however, a district court can review the government's decision not to move for downward departure based on substantial assistance even when there is no plea agreement. *See Wade*, 504 U.S at 184–85, 112 S.Ct. at 1843.

Second, this case centers on whether the government's *offer* to consider making a downward departure motion violated *Wade*, not whether the government's *refusal* to file a downward departure motion lacked a rational relationship to a legitimate government objective. Clearly the government's refusal was rational because Maddox never accepted the government's offer. He did not verbally accept the government's offer or perform either of the conditions required to qualify for the downward departure motion. He did not plead guilty to all of the charges against him, and he did not agree to testify at trial against Bullock. Therefore, the government's refusal to make the motion for Maddox did not violate the requirements of *Wade*.

■ The district court was troubled by the government's offer, however, because the government made the same offer to *both* Maddox and Bullock and because the offers appeared to be mutually exclusive: the first defendant's acceptance essentially precluded the other defendant's eligibility for the motion. The district court found this distasteful because it, in effect, reduced the decision as to which defendant would receive the motion to gamesmanship between the defendants. Furthermore, the government made these offers without any consideration of the defendants' comparative assistance or culpability.

■ We begin our analysis by noting that neither defendant had a right to a downward departure motion. The government has the power to make such motions, but not a duty to do so. *Wade*, 504 U.S. at 184–85, 112 S.Ct. at 1843. Clearly the government could have offered either defendant the opportunity to receive the substantial assistance motion in exchange for pleading guilty and testifying against the other defendant. The government also could have refrained from making the offer to both defendants. We find no difficulty in the government's decision to make the same offer to both defendants, even though it encouraged some maneuvering between the defendants during plea negotiations. The government placed reasonable conditions on receiving the motion, which either defendant, but not necessarily both, could satisfy.

■ Such versions of the "Prisoners' Dilemma" during plea negotiations are rather commonplace because they are effective and courts have held that they are constitutional. *See, e.g., Page v. United States*, 884 F.2d 300 (7th Cir.1989) (discussing the Prisoners' Dilemma and denying an ineffective counsel claim based upon counsel's inability to solve a Prisoners' Dilemma plea offer). The combination of statutory mandatory minimum sentences and the exclusive power to move for downward departure based upon substantial assistance allow the government to play hardball during plea negotiations. As the district court noted, motions for substantial assistance do not require the government to reward the least culpable or the most helpful codefendant. JA at 387.[7] Because neither defendant has a right to such a motion, neither can claim an exclusive right to an offer made by the government to both defendants.

We recognize that the government did not articulate a rational reason during the sentencing hearings for its offer to both defendants.[8] Nonetheless, the district court found

---

7. After stating this correct point of law, however, the district court proceeded to assess the relative culpability of and assistance rendered by Maddox and Bullock. JA at 387–88. Although Maddox presents a sympathetic case, the government had legitimate reasons for the structuring of its plea offer and for refusing to move for downward departure for Maddox.

8. The government justified its refusal to make the motion for Maddox based upon the general con-

that the government had a legitimate interest in expediting plea negotiations, but then concluded that the means employed by the government in this case "simply do not pass constitutional muster." JA at 389. In its brief to this court, the government claims that its plea offer was rational because it sought to secure two convictions for armed bank robbery and use of a firearm during a crime of violence. Appellant's Br. at 20. Given that the government had legitimate ends, we turn to the government's means of selecting the recipient of the downward departure motion.

We conclude that the means chosen were rationally related to the legitimate ends of securing two convictions, expediting plea negotiations, and avoiding the expense of at least one trial. As noted above, we are not troubled by the Prisoners' Dilemma aspect of the government's plea offers to Maddox and Bullock. The government offered each defendant the opportunity to qualify for the motion. The fact that the government did not select which one should receive the opportunity is of no import. The purpose of the "joint" offer was not to favor the defendant who provided the *most* or *best* assistance, but simply to favor the one who agreed to the terms *first*. Then the government would have to evaluate the assistance provided by each defendant and decide in a manner conforming with *Wade* whether the defendants deserved the motion. We conclude that because the government's offer employed rational means to further legitimate government objectives, the district court should not have granted Maddox's motion for downward departure.

The district court also found as a matter of fact that Maddox had supplied the government with substantial assistance requiring downward departure. Because we find that

the government's offer to Maddox and Bullock did not violate their due process rights and that the government's refusal to make the downward departure motion for Maddox was rationally related to a legitimate government objective as required by *Wade*, we need not address the merits of the court's finding. We note, however, that Maddox failed to provide the substantial assistance upon which the government had predicated its offer. The government's offer satisfied the concerns of due process as required by *Wade*, and we therefore reverse the district court's downward departure from the five-year mandatory minimum sentence and the Sentencing Guidelines range based on Maddox's substantial assistance.

## III.

■ The government also contends that the district court erred in granting Maddox a downward departure from the Sentencing Guidelines range for extraordinary vulnerability to victimization in prison.[9] The district court followed the Second Circuit's holding that " '[e]xtreme vulnerability of criminal defendants. is a factor that was not adequately considered by the Commission and [is] a proper ground for departure.' " JA at 396 (quoting *United States v. Lara*, 905 F.2d 599, 603 (2d Cir.1990)). We review de novo a district court's decision that the Sentencing Commission did not adequately consider a particular factor as a potential basis for departure. *United States v. Hummer*, 916 F.2d 186, 192 (4th Cir.1990).

■ This Circuit has not addressed the issue of whether the Sentencing Commission considered extreme vulnerability of victimization in prison as a potential basis for departure. We agree with the Second Circuit that the facts in *United States v. Lara*, 905 F.2d

cern of doing justice to the Sentencing Guidelines and, more specifically, because substantial assistance motions are rare and Maddox clearly did not satisfy any of the government's conditions for the motion.

9. The district court states that extreme vulnerability and extraordinary family ties are "alternative" and "additional and independent" "grounds for departure," JA at 396–98, but the

court does not explain whether it is departing from the Sentencing Guidelines range for Counts One and Two, or the mandatory minimum sentence for Count Three. We presume that the district court intended to depart only from the Sentencing Guidelines range because in this case the only basis recognized by law for a departure below a mandatory minimum sentence imposed by statute is substantial assistance on motion of the government. 18 U.S.C. § 3553(e); *United*

599 (2d Cir.1990), discussed *infra*, suggest that the Sentencing Commission did not adequately address extreme vulnerability as a ground for departure. We hold, however, that this ground for departure should be construed very narrowly. In particular, we note that the mere combination of the factors included in the Sentencing Guidelines for downward departure does not present an unusual or extraordinary case justifying a downward departure. *United States v. Goff,* 907 F.2d 1441, 1447 (4th Cir.1990).

Because we hold that the departure recognized in *Lara* exists as a matter of law under certain circumstances, we review the district court's factual findings that Maddox qualified for the departure for clear error. *United States v. Brand,* 907 F.2d 31, 33 (4th Cir. 1990). In this case, the district court's finding that Maddox's circumstances were similar enough to those of the defendant in *Lara* to warrant a downward departure was clearly erroneous.

In *Lara,* the defendant was described as a "delicate looking young man ... [with] a certain sweetness about him," who had been victimized in prison because of his diminutive size, immature appearance, and bisexual orientation. *Lara,* 905 F.2d at 601. The defendant claimed that when two tough male inmates attempted to coerce him into becoming a male prostitute, the head of the jail responded by placing him in solitary confinement. *Id.* The district court departed downward from the applicable Sentencing Guidelines range because the defendant's vulnerability, appearance, and sexual orientation rendered him peculiarly vulnerable to victimization, beyond the considerations of the Sentencing Commission. The Second Circuit, finding that the district court did not abuse its discretion, affirmed the reduced sentence. *Id.* at 605.

After considering the totality of the circumstances relating to Maddox's sentencing, the district court found that he was entitled to a downward departure because "he is easily led, susceptible to misuse by others, meek and cautious in demeanor, and slight in appearance." JA at 396. The district court, however, did not cite any specific support for these findings. Instead, the court stated only that it generally relied on evidence presented during sentencing, the court's observations of Maddox during trial and the various hearings, and the court's familiarity with the materials compiled in connection with the case.

We find that the reasons stated by the district court are inadequate to justify a downward departure. Our review of the record indicates that the evidence does not suggest that Maddox would be nearly as vulnerable in prison as the defendant in *Lara.* We simply cannot condone departing from the applicable Sentencing Guidelines range for a crime of violence involving a gun merely because the defendant appears to be meek, cautious, and easily led. Except under truly extraordinary circumstances, prisons exist for those who commit crimes, not just for tough criminals.[10]

Regarding evidence in the record, we acknowledge that Maddox possesses borderline intelligence and suffers from dependent personality disorder. The Sentencing Guidelines, however, provide that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in [5K.2]." U.S.S.G. § 5H1.3. Furthermore, Dr. Johnson and Dr. Fowles, two psychologists familiar with prison populations, testified that these conditions were not unusual among inmates and that a federal prison could adequately provide for Maddox's safety. The only evidence to the contrary was presented by Dr. Conners, a court-appointed psychologist with little expe-

---

*States v. Patterson,* 38 F.3d 139, 146 n. 8 (4th Cir.1994).

**10.** We are also unpersuaded by the district court's characterization of Maddox as "slight in appearance." The Sentencing Guidelines clearly state that:

Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside

the applicable guideline range. However, an *extraordinary physical impairment* may be a reason to impose a sentence below the applicable guideline range; *e.g.,* in the case of a *seriously infirm* defendant, home detention may be as efficient as, and less costly than, imprisonment.

U.S.S.G. § 5H1.4 (1992) (emphasis added). Furthermore, the presentence report described Maddox as 5' 10" tall and weighing 155 pounds.

rience in dealing with criminals and prisons. We conclude that the district court erroneously credited the testimony of Dr. Conners, who could not offer an expert opinion as to what Maddox would face in prison or how the prison could attempt to accommodate him.

Because Maddox's case does not involve the extraordinary circumstances warranting a downward departure under *Lara*, we reverse the district court's alternate ground for granting a downward departure from the Guidelines range for extraordinary vulnerability.

## IV.

The government also challenges the district court's sua sponte decision to grant Maddox a downward departure for extraordinary family ties under U.S.S.G. § 5H1.6. The government contends that Maddox does not qualify for the departure and that the district court's failure to provide advance notice that it would consider this factor requires this Court to remand the case for further fact-finding on the family ties issue.

The Sentencing Guidelines state that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. This Circuit has construed downward departures based on family ties very narrowly. *E.g., United States v. Bell,* 974 F.2d 537, 538 (4th Cir.1992) (holding that "[d]ownward departures are permitted only in the rare case," and that the possible destruction of a family caused by the extended incarceration of the family's sole earner was not extraordinary); *United States v. Brand,* 907 F.2d 31, 33 (4th Cir.1990) (holding that the separation of a mother, who was the sole custodial parent, from two children was not extraordinary).

The district court points out that Maddox "relates well" to his severely mentally retarded sister, that he provides invaluable care for her and his mother, and that he is "crucial to the structure and stability of his family." JA at 397. These findings, however, do not demonstrate that Maddox's family ties are extraordinary in light of past Circuit precedent. However, because the court raised the issue sua sponte during the fifth sentencing hearing, both Maddox and the government should be allowed to further develop the record on this possible ground for departure.

In *Burns v. United States,* 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), the Supreme Court held that:

> [B]efore a district court can depart *upward* on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, Rule 32 [of the Rules of Criminal Procedure] requires that the district court give the parties reasonable notice that it is contemplating such a ruling.

*Id.* at 138, 111 S.Ct. at 2187 (emphasis added); *accord United States v. Maxton,* 940 F.2d 103, 106 (4th Cir.), *cert. denied,* 502 U.S. 949, 112 S.Ct. 398, 116 L.Ed.2d 347 (1991). The Second and Seventh Circuits have held that the same notice requirement should apply when a district court seeks to depart downward. *United States v. Alba,* 933 F.2d 1117 (2d Cir.1991); *United States v. Andruska,* 964 F.2d 640 (7th Cir.1992); *cf. United States v. Goff,* 907 F.2d 1441, 1446 n. 4 (4th Cir.1990) (recognizing but declining to reach this issue). We agree with these circuits that a district court should depart from the Sentencing Guidelines only after both the government and the defendant have received proper notice in order to develop a full record. Therefore, we vacate the district court's granting of a downward departure from the Guidelines range because of Maddox's extraordinary family ties and remand so that Maddox and the government may properly address the issue.[11]

## V.

We are well aware of the difficulties that statutory mandatory minimum sen-

---

11. We note that even if the district court on remand departs from the Sentencing Guidelines on the basis of extraordinary family ties for Counts One and Two, it is still required by law to impose the five-year mandatory minimum sentence set forth in § 924(c) for Count Three.

tences and the Sentencing Guidelines impose on district courts faced with the unenviable task of sentencing criminals who present sympathetic cases. As Chief Judge Ervin has aptly noted in another case, however, although "[i]t is perhaps understandable for sentencing judges ... to feel constrained by the Guidelines (as well as mandatory minimum sentences) on occasion .... we must admonish the district courts instead to apply the Guidelines as written. Attempts, in effect, to manipulate the Guidelines in order to achieve the 'right result' in a given case are inconsistent with the Guidelines' goal of creating uniformity in sentencing." *United States v. Harriott*, 976 F.2d 198, 202–03 (4th Cir.1992).

For the foregoing reasons, we reverse the district court's downward departure based on substantial assistance. We also reverse the downward departure based on vulnerability. We vacate the downward departure based on extraordinary family ties and remand this issue to the district court for further factfinding.

*REVERSED IN PART, VACATED IN PART, AND REMANDED.*