**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                                          No. 99-4886

JOHN STEVEN LEROSE,
Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Robert J. Staker, Senior District Judge.
(CR-99-80)

Argued: May 3, 2000

Decided: July 13, 2000

Before MOTZ and TRAXLER, Circuit Judges, and
Frank W. BULLOCK, Jr., United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Traxler wrote the
opinion, in which Judge Motz and Judge Bullock joined.

_____

**COUNSEL**

**ARGUED:** Susan Marie Arnold, Assistant United States Attorney,
Charleston, West Virginia, for Appellant. Benjamin Lee Bailey, BAI-
LEY & GLASSER, L.L.P., Charleston, West Virginia, for Appellee.
**ON BRIEF:** Rebecca A. Betts, United States Attorney, Charleston,
West Virginia, for Appellant.

_____

**OPINION**

TRAXLER, Circuit Judge:

The United States appeals the district court's downward sentencing departure in the case of John Steven LeRose ("LeRose"). We vacate the sentence and remand for resentencing.

I.

On June 10, 1999, LeRose pled guilty to a two-count information. Count One accused LeRose of executing, aiding and abetting a scheme and artifice to defraud a financial institution in violation of 18 U.S.C.A. § 1344 (West 2000). Count Two accused LeRose of filing a false income tax return in violation of 26 U.S.C.A. § 7206(1) (West 1989). These charges stemmed from an elaborate check-kiting scheme in which three of LeRose's brothers also participated.[1]

As the owners of several automobile dealerships and other business interests, the LeRose family occupied a prominent position in the community of Summersville, West Virginia. LeRose served as mayor of the town from 1985 until his conviction in 1999. However, evidence presented to the grand jury indicated that the LeRose brothers frequently used corporate funds to pay for extravagant personal expenses. As the businesses became less profitable, the LeRose brothers concocted a check-kiting scheme, involving personal and business checking accounts, in order to keep the businesses afloat. The three banks used by the LeRoses were First Community Bank, Inc. ("First Community" or "the Bank"), United National Bank, and Bank One. The kiting scheme began on a small scale in January 1995 and grew to such an extent that the massive number of checks involved generated approximately $64,000 in insufficient funds fees per year at First Community alone. Unaware of the scope of the scheme and believing that the LeRose family would eventually rectify the problems with their accounts, the chief executive officer of the Summersville branch

_____

[1] "Check kiting, at root, is a plan designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds." United States v. Doherty, 969 F.2d 425, 428 (7th Cir. 1992).

2

of First Community avoided a confrontation with the LeRoses over their irregular banking practices. The kiting scheme was eventually uncovered by accident when a United National Bank employee incorrectly coded a LeRose check which led to an internal review. United National Bank and Bank One then returned checks written on other LeRose accounts, primarily accounts at First Community, and thus protected themselves from loss. In the end, First Community suffered a loss of $3,364,958.

In sentencing LeRose, the district court adopted the guideline application in the presentence report, which imposed a base offense level of six for the kiting scheme, see U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2F1.1(a) (1998), increased by thirteen levels based upon the $3,364,958 loss to First Community. See U.S.S.G. § 2F1.1(b)(1)(N). LeRose received an additional two-level enhancement because the fraud involved more than minimal planning, see U.S.S.G. § 2F1.1(b)(2), resulting in a total offense level of twenty-one for Count One. LeRose's base offense level for Count Two, which resulted in a $7,678.24 tax loss to the federal government, was nine. See U.S.S.G. §§ 2T1.1(a)(1), 2T4.1(D). However, because the two offenses were closely related, they were grouped pursuant to U.S.S.G. § 3D1.2 for an offense level of twenty-one. LeRose then received a three-level decrease for acceptance of responsibility, see U.S.S.G. § 3E1.1, yielding a total offense level of eighteen. With a Category I criminal history, LeRose's guideline range was twenty-seven to thirty-three months incarceration. See U.S.S.G. Ch.5, Pt.A (Sentencing Table).

Departing from the guidelines, the district court sentenced LeRose to only twelve months and one day in prison. The court gave two reasons for its action. First, the court was of the opinion that the $3,364,958 loss to First Community overstated the seriousness of the offense. See U.S.S.G. § 2F1.1, comment. (n.11). Second, the court decided that LeRose was entitled to a reduction for substantial assistance under U.S.S.G. § 5K1.1 even though the government declined to make such a motion. The government appeals both grounds for departure.

II.

We review the sentencing court's downward departure for abuse of discretion. See Koon v. United States, 518 U.S. 81, 91 (1996) (holding

3

that "appellate court[s] should not review the departure decision <u>de novo</u>, but instead should ask whether the sentencing court abused its discretion"); <u>see also United States v. Barber</u>, 119 F.3d 276, 283 (4th Cir. 1997) (en banc) (observing that the Supreme Court in <u>Koon</u> "made clear that it intended to adopt a traditional abuse of discretion standard").

A.

First, the government alleges that the district court abused its discretion when it departed from the guidelines on the belief that the calculation of loss overstated the seriousness of LeRose's fraudulent conduct. The commentary to U.S.S.G. § 2F1.1 provides:

> In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example, where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it. In such cases, a downward departure may be warranted.

U.S.S.G. § 2F1.1, comment. (n.11). In determining that the $3,364,958 loss to First Community overstated the seriousness of the offense, the district court cited four factors:

> - the Bank, upon discovering that something was amiss with the LeRoses' checking accounts, delayed taking effective action because it believed the LeRoses had the financial wherewithal to pay;
>
> - the Bank's conduct led the LeRoses to believe that their actions were "less unlawful and involving far less culpability than the law attributes to check kiting";
>
> - the Bank's chief executive officer mistakenly believed that the Bank profited from the fees generated by overdrafts; and
>
> - the Bank reached a settlement with the LeRoses on repayment.

4

J.A. 261. At the outset we note that despite the district court's disagreement with the Bank's handling of the LeRoses' accounts, there is absolutely no evidence that anything done by the Bank affected the amount of its loss. In fact, there is no dispute that prompter action by First Community once the scheme was discovered would not have affected the amount of loss. See United States v. Carey, 895 F.2d 318, 323 (7th Cir. 1990) (holding that when "defendant individually orchestrated and carried out the fraud on the bank," departure for the loss overstating the seriousness of the offense was unwarranted because defendant's "actions were the sole cause of the loss to the bank"). The $3,364,958 loss was real, not inflated, and in no way overstated the seriousness of the LeRoses' intricate scheme. Moreover, the LeRoses' kiting bears no resemblance to the example given in the guideline where "no one would seriously consider honoring" an obviously fraudulent instrument. U.S.S.G. § 2F1.1, comment. (n.11). The various checks were drawn on accounts at three reputable financial institutions and were facially valid. Consequently, the district court's reliance upon U.S.S.G. § 2F1.1, comment. (n.11) to depart was without foundation.

However, our inquiry does not end here. The district court enumerated four specific reasons why a downward departure was warranted. Though used by the district court to support departure based on an overstatement of the seriousness of the offense, the enumeration more accurately reflects a belief that there was victim misconduct and extraordinary restitution. Accordingly, we will examine these grounds to determine if they afford a basis for departure.

A district court must "impose a sentence of the kind, and within the range" resulting from a proper application of the guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C.A. § 3553(b) (West Supp. 2000). In analyzing the consideration given by the Commission to a potential ground for departure, "a sentencing court must focus on whether the factor is taken into account by the guidelines, policy statements, or commentary and whether it is encompassed within the heartland of situations to which the applicable guideline was intended to apply." Barber, 119 F.3d at

5

280. The heartland, crucial to a proper analysis, is defined as "a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. Ch.1, Pt.A, intro. comment. 4(b). In deciding whether a factor is an appropriate ground for departure, a sentencing court must ascertain whether the factor is forbidden, encouraged, discouraged, or unmentioned by the Sentencing Commission as a ground for departure. See Koon, 518 U.S. at 94-95; see also Barber, 119 F.3d at 280. If the factor is encouraged, as are victim misconduct and restitution, see U.S.S.G. §§ 5K2.10, 3E1.1, comment. (n.1(c)), "the court is authorized to depart if the applicable Guideline does not already take it into account." Koon, 518 U.S. at 96. However, if the applicable guideline has taken the encouraged factor into account, a court may depart "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Id.

1. Victim Misconduct

The conduct of First Community was central to the district court's determination that a departure in sentencing was warranted. According to the guidelines, "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense." U.S.S.G. § 5K2.10. The factors enumerated in § 5K2.10 are tailored to crimes involving violence, and the guideline makes clear that only in unusual cases will victim misconduct "warrant a reduced penalty in the case of a non-violent offense." Id. By way of example of an appropriate non-violent case warranting departure, the guideline states that "an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation." Id. In interpreting § 5K2.10, we have emphasized that not only must the victim's conduct be provocative, but "the victim must actually have done something wrong." United States v. Morin, 80 F.3d 124, 128 (4th Cir. 1996).

The allegations of misconduct in the present case were based on the Bank's delay in confronting the LeRoses and the chief executive officer's mistaken belief that fees generated by overdrafts were profitable. Finding that "the so-called and alleged victim invited what happened to it," the district court concluded that the case fell outside the

6

heartland of U.S.S.G. § 2F1.1. J.A. 220. We believe that the district court abused its discretion in departing from the guidelines based on the Bank's handling of the LeRose accounts. The Bank was not a "so-called and alleged victim," but an actual victim that lost $3,364,958 because of an elaborate check-kiting scheme. In cases of non-violent offenses, the guideline provides that "provocation and harassment" of the defendant may warrant a departure for victim misconduct. U.S.S.G. § 5K2.10. Provocation necessarily involves deliberate conduct that stirs a defendant to action, and such misconduct is simply absent from the present case--the Bank in no way goaded the LeRoses into launching the kiting operation. On the contrary, the record reveals that the LeRoses spent a great deal of time planning and coordinating their efforts to defraud the three banks.

Labeling First Community as a provocateur also ignores the fact that kiting schemes work because the different banks involved do "not see what [is] going on with each of the other . . . accounts--that [is] how the kite [is] able to fly." United States v. Yoon, 128 F.3d 515, 525 (7th Cir. 1997). We find completely unavailing the argument by LeRose that the Bank's inaction somehow lessens his culpability so as to entitle him to a reduction in sentence. Clearly, the LeRoses' mastery of manipulation rather than the Bank's conduct accounts for the enormous loss.

Furthermore, LeRose can take no solace in the fact that the chief executive officer of the Summersville branch believed that overdraft fees were profitable. Bank officers from First Community testified before the grand jury that overdraft fees represented "reimbursement for overhead that a bank must utilize to return checks" and in no way represented profit to the bank. J.A. 84. In fact, one officer testified that the $64,000 assessed in fees during the last year of the check-kiting scheme was inadequate and that the Bank actually lost $44,000 in the wash because it was forced to borrow money to fund the LeRose accounts. Morever, undue emphasis on the chief executive officer's attitude toward fees gives the illogical appearance that the bank gladly exchanged $3 million for $64,000 in fees. Again, this ignores the deception employed by the LeRoses and the efficacy of a kiting scheme which defrauds multiple banks having no knowledge of account activity at the other financial institutions. See Yoon, 128

7

F.3d at 525. Thus, the chief executive officer's misconception concerning overdraft fees is of no help to LeRose.

In sum, the evidence did not establish that First Community's lack of action provoked or led to the fraud. Consequently, there was no "misconduct" by the victim as contemplated by the guidelines and therefore no grounds for departure based on the Bank's conduct. Hence, the district court abused its discretion in basing its decision to depart on the Bank's response to the problem LeRose created.

2. Restitution

The district court also relied for its departure on the July 29, 1999 final settlement with the Bank which entailed the LeRoses executing a note and agreeing to repay the $3,364,958. If all payments are made as scheduled, the Bank will be made whole in approximately four or five years. This court has stated that "restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility [U.S.S.G. § 3E1.1, comment. (n.1(c))], can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or `usual.'" United States v. Hairston, 96 F.3d 102, 108 (4th Cir. 1996).

In Hairston, we held that restitution equaling less than half of the embezzled funds and resulting from the generosity of friends was not exceptional. Id. at 108-09. We further noted that payment of such a small percentage of the sum owed normally does not "constitute an exceptional circumstance meriting departure." Id. at 108. Indeed, extraordinary efforts at making restitution are readily apparent when they occur. For example, the Eighth Circuit recently upheld a departure when the defendant began making restitution one year before the indictment, worked sixteen hours per day to maintain the value of his assets, relinquished his life insurance policy and his wife's certificate of deposit, gave up his home, and paid nearly ninety-four percent of the amount owed to the victim before sentencing. See United States v. Oligmueller, 198 F.3d 669, 672 (8th Cir. 1999). In the present case, the LeRoses have merely promised to make full restitution to First Community by some date four or five years in the future. Though we have no reason to doubt that the LeRoses will eventually make full restitution, there is nothing exceptional about the settlement agreement with the Bank. The LeRoses fraudulently obtained from the

8

Bank in excess of $3 million and have agreed to repay the funds. This shows some responsibility with regard to their obligations, but not to a degree "that is truly extraordinary and substantially in excess of that which is ordinarily present." United States v. Weinberger, 91 F.3d 642, 645 (4th Cir. 1996) (internal quotation marks omitted). Hence, the district court abused its discretion in departing downward based on the restitution agreement.

B.

The district court also departed from the guidelines because it concluded that LeRose "was entitled to a motion for substantial assistance on his behalf from the Government." J.A. 247.**2** The guidelines provide that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1 (emphasis added). As a general rule, "[t]he government has the power to make such motions, but not a duty to do so." United States v. Maddox, 48 F.3d 791, 796 (4th Cir. 1995); see also United States v. Schaefer, 120 F.3d 505, 508 (4th Cir. 1997) ("Unlike all other grounds for departure, in order for a district court to base a departure upon a defendant's substantial assistance to law enforcement authorities, the Government must first move the district court to do so."). Nonetheless, courts may review a prosecutor's refusal to file a motion for substantial assistance and grant relief if the refusal is based on an unconstitutional motive such as race or religion, or is not rationally related to a permissible government objective. See Wade v. United States , 504 U.S. 181, 185-86 (1992); Maddox, 48 F.3d at 795.

Before a court may order discovery or hold an evidentiary hearing on the government's refusal to make the motion, the defendant must first make a "substantial threshold showing" that the refusal resulted from improper or suspect motives. Wade, 504 U.S. at 186 (internal quotation marks omitted). Mere allegations of unconstitutional motives on behalf of the prosecutor are not enough to carry this burden. See United States v. Wallace, 22 F.3d 84, 87 (4th Cir. 1994) (explaining that "Wade imposes upon a defendant the burden to do

_____

**2** LeRose does not argue that he was entitled to the substantial assistance motion because of a provision in the plea agreement.

9

more than merely allege unconstitutional motive in order to require judicial inquiry").

In attempting to make a threshold showing, LeRose argued that the assistance he provided to the government was almost identical to that provided by his brother Rodney who received a substantial assistance motion. LeRose averred that he and Rodney were directed by the same federal agents, approached many of the same suspects, subjected their families to similar dangers, and performed their assigned duties in good faith. Based on these assertions, LeRose contended that the government's refusal to make a substantial assistance motion for him was not rationally related to a legitimate government end.

As an initial matter the proffer by LeRose was clearly insufficient to identify and demonstrate any improper basis for the government's decision, and at this point the court's inquiry should have ended. However, instead of deciding whether LeRose had made a "substantial threshold showing," the district court impermissibly shifted to the hearing portion of the <u>Wade</u> framework and directed the government to respond with reasons for refusing to make the motion on LeRose's behalf. The government explained that it had evaluated the assistance of both brothers and concluded that LeRose's assistance was not as substantial as Rodney's. The government pointed out that LeRose's cooperation, though undertaken in good faith, did not lead to any charges, arrests, or filings of informations. The government further observed that LeRose never testified at trial or in front of a grand jury. As for the comparison with Rodney's efforts, the government noted that Rodney offered extensive assistance in an investigation of a corrupt state senator who later pled guilty to various charges. In the course of the investigation, Rodney participated in the taping of approximately thirty-five or forty meetings with the senator. While LeRose also played a role in the investigation of the senator, the materials submitted by LeRose to the district court indicated that this was limited to "telephone tag" and that LeRose never made contact with the senator.

After hearing the government, the district court concluded that the government's conduct deprived LeRose of "due process and equal protection under the specific facts of this case, and . . . no legitimate government objective is served by such disparate treatment of [LeRose]." J.A. 234. We disagree. First, as previously stated, LeRose

10

failed to make a substantial threshold showing as required by Wade. The lion's share of the information provided to the district court simply cataloged LeRose's efforts. Explanations of the extent of a defendant's assistance do not entitle a defendant to a hearing. See Wade, 504 U.S. at 187. Nor does the mere fact that the government made the motion for one brother, but refused to make it for the other brother, absent a suspect reason, establish a substantial threshold showing. "[M]otions for substantial assistance do not require the government to reward the least culpable or the most helpful codefendant." Maddox, 48 F.3d at 796. When a defendant does not demonstrate an improper refusal by the government to make a § 5K1.1 motion, the inquiry comes to an end. Second, even if we were to conclude that LeRose carried his burden and made a substantial threshold showing, the government's decision was clearly rationally related to a legitimate government end. Rodney's significant efforts in obtaining the conviction of the state senator obviously played a large part in the government's decision to make a motion for substantial assistance and cannot be compared to LeRose's unsuccessful attempts to establish contact with the senator. In this important regard, LeRose's assistance simply did not match that of his brother. See United States v. Doe, 170 F.3d 223, 224 (1st Cir. 1999) (noting that when the government receives no benefit from a defendant's efforts or information, the government's refusal to make a substantial assistance motion is rationally related to a legitimate government end). Affirmation of the district court's departure based on LeRose's assistance would encourage criminal defendants to challenge the government's refusal to make such a motion on the mere ground that they cooperated, a result contrary to the established law of this circuit. See Wallace , 22 F.3d at 87 (concluding that full and truthful cooperation does not by itself entitle a defendant to a substantial assistance motion).

In sum, the district court erred in departing from the guidelines on the ground that LeRose was entitled to a substantial assistance motion from the government.

III.

For the foregoing reasons, we vacate LeRose's sentence and remand for resentencing in accordance with this opinion.

VACATED AND REMANDED