37 F.3d 353
 UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
Edward D. MARTINSON, Defendant-Appellant, Cross-Appellee.
 Nos. 93-2379, 93-2643.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 9, 1994.
Decided Oct. 7, 1994.
 
 James L. Santelle, Asst. U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.
 Edward A. Scott, III (argued), Robert G. Riffner, Riffner, Freeman & Scott, Schaumburg, IL, for defendant-appellant.
 Before BAUER, and FLAUM, Circuit Judges, and FOREMAN,* District Judge.
 BAUER, Circuit Judge.
 
 
 1
 A jury convicted Edward Martinson of five counts of mail and wire fraud, in violation of 18 U.S.C. Secs. 1341, 1343. It found that Martinson had fraudulently induced six seafood distributors to deliver partial payments for the purchase of certain kinds of food processing equipment that Martinson had agreed to manufacture but never did. Martinson appeals several aspects of his prosecution: the district court's denial of his motion to reschedule, his conviction on the grounds of insufficiency of the government's evidence against him, and his sentence. In addition, the government cross-appeals the district court's finding that Martinson accepted responsibility for his crime and the subsequent reduction of Martinson's sentence. We affirm Martinson's conviction and those issues he raises on appeal regarding his sentence; further, we reverse the district court's decision that Martinson accepted responsibility for his crime and remand for resentencing.
 
 I. Facts
 
 2
 Martinson entered the food processing equipment manufacturing industry in 1986, doing business as Martinson & Associates of Green Bay, Wisconsin. His objective was to manufacture mechanical equipment used in the commercial processing of seafood products. In his initial foray into this business, he successfully performed under contracts with Farwest Fisheries, Inc. to produce and deliver retort baskets used to process seafood. To secure this contract, Martinson used as his agent Daniel C. Schneringer of Kirkland, Washington, doing business as Schneringer & Associates, because Schneringer had expertise in this arena and maintained several contacts within the cannery industry in the Pacific Northwest.
 
 
 3
 Martinson renewed his association with Schneringer in late 1987 to execute similar contracts with other canneries. Schneringer was to receive a commission on all sales that he negotiated, and Martinson was responsible for all aspects of production, shipment, and billing. In late 1987 and early 1988, Schneringer negotiated agreements with Farwest Fisheries and five other canneries to produce and deliver seafood processing machinery. Each cannery agreed to and did advance to Martinson fifty per cent of the total purchase price of machinery it ordered; the canneries forwarded these funds either by the United States mail or via wire.
 
 
 4
 When Martinson failed to meet the first delivery deadline, Schneringer called Martinson in hopes of learning the reasons for the delay. When Martinson offered nothing but unsatisfactory excuses, Schneringer scheduled a trip to inspect Martinson's facilities. In an effort to dissuade Schneringer from coming, Martinson admitted to Schneringer that he had not yet begun to manufacture the food processing equipment. Undeterred, Schneringer travelled to Green Bay, only to discover that Martinson did not own or even have access to the necessary manufacturing facilities. At this point, Martinson claimed that he had subcontracted with two other firms to manufacture the equipment. Schneringer soon learned from these companies that Martinson had lied yet again.
 
 
 5
 The only contact Martinson had had with either of these two firms was to sell some of his manufacturing equipment necessary to produce the seafood processing equipment to FRP Plastics, Inc., owned by Louis H. LaCount. LaCount testified that Martinson had admitted to him that Martinson had entered into manufacturing contracts and had accepted advances, but had done nothing to meet the orders. Martinson also admitted to LaCount that he had used the advances to finance the operation of Martinson's tavern in Green Bay, the Country Club Bar. It seems that Martinson spent over $80,000 (of the $112,000 advanced to him) to renovate and operate the tavern. Martinson spent this money despite never delivering the equipment ordered by the canneries or refunding any of the money he received from them.
 
 II. Analysis
 
 6
 A. Denial of Martinson's motion to reschedule his trial
 
 
 7
 "Because of the broad-ranging, almost standardless discretion that a trial court must exercise in scheduling trials, the grant or denial of a [motion to reschedule a trial] is subject to appellate review only for an abuse of discretion." United States v. Stevenson, 6 F.3d 1262, 1265 (7th Cir.1993) (citations omitted). To establish that the district court abused its discretion, Martinson must show that the decision was arbitrary and that it caused him actual prejudice. United States v. Woods, 995 F.2d 713, 716 (7th Cir.1993). Perhaps the heavy burden which Martinson bears with respect to this issue explains the brevity of his argument in his brief.
 
 
 8
 A brief recitation of the circumstances surrounding the district court's decision to deny Martinson's motion demonstrates that its decision neither was arbitrary nor resulted in actual prejudice. On January 29, 1993, Magistrate Judge Goodstein conducted an arraignment and plea hearing in this matter, where Martinson pled not guilty to the charges. At this hearing, Magistrate Judge Goodstein established a schedule for the conduct of further proceedings and announced that Martinson's trial would commence on March 23, 1993, before Judge Evans. On March 11, 1993, Martinson's counsel sent a letter to Judge Evans requesting that the trial be rescheduled. In support of his request, Martinson's counsel stated that his own workload coupled with Martinson's unavailability for a period of several weeks in February left him with insufficient time to prepare Martinson's defense. The government offered no formal objection to this request. Judge Evans denied this request following a March 12, 1993, telephone conversation with counsel. Martinson's counsel renewed the motion at the start of trial on March 23, 1993, which Judge Evans again denied.
 
 
 9
 In denying the motions, Judge Evans noted that Martinson did not object to the trial date at the time it was announced. He further noted that when Martinson requested leave from the court to travel to Australia for several weeks in February, his counsel made no motion to reschedule the trial. Judge Evans also cited as support for his decision to deny the motion his heavy docket and the fact that forty-four venirepersons were waiting for the start of the trial.
 
 
 10
 Martinson's only argument is that since it took the government five years to develop its case, he should have been granted a few weeks to mount his defense. He glosses over the fact that had he stuck around in February, he would not have created the time crunch his counsel experienced in preparing his defense. Judge Evans' reasons, on the record, clearly indicate that his decision was not arbitrary. Martinson, moreover, offers no evidence that he suffered actual prejudice from Judge Evans' decision. Consequently, we hold that Judge Evans appropriately exercised his discretion in denying Martinson's last-minute motions to reschedule his trial.
 
 B. Sufficiency of the evidence
 
 11
 In reviewing Martinson's claim, we must review the evidence in a light most favorable to the government, drawing all reasonable inferences. United States v. Boykins, 9 F.3d 1278, 1282 (7th Cir.1993); United States v. Gutierrez, 978 F.2d 1463, 1468 (7th Cir.1992). Then, we must ascertain whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Boykins, 9 F.3d at 1282 (quoting United States v. Tanner, 941 F.2d 574, 586 (7th Cir.1991)). In this case, the government's evidence easily supports Martinson's conviction.
 
 
 12
 The government presented as witnesses representatives of all six companies defrauded by Martinson. In addition, it offered Schneringer's and LaCount's testimonies regarding their respective encounters with Martinson. Finally, the government presented bank records and other documentation demonstrating that Martinson received the advances, deposited them, and spent the proceeds on his bar and in other ways unrelated to the manufacture of seafood processing equipment. All of this evidence compels just one result: that Martinson bilked these companies out of $112,000 and never intended to repay them.
 
 
 13
 Martinson's argument to the contrary simply restates his testimony from his trial. He claims that the delivery dates were never firm, that Schneringer failed to provide him with information necessary to manufacture the equipment, that Schneringer canceled the contracts, and that he, Martinson, never intended to swindle the companies. He claims that these excuses preclude a trier of fact from finding the requisite criminal intent; he is wrong. This testimony was presented to the jurors, who chose not to believe him. In light of the government's evidence, it would be hard to fault them.
 
 
 14
 Martinson also argues that certain statements made by the prosecutor and Judge Evans at Martinson's sentencing hearing indicate that they did not believe Martinson had the requisite intent. These statements do no such thing. First, these statements were made at the sentencing hearing after the trial in which the prosecutor participated, over which Judge Evans presided, and where Martinson was found guilty beyond a reasonable doubt by a jury of his peers. Nothing in the sentencing hearing bears on Martinson's conviction. Second, the statements that Martinson may not have harbored an evil intent from the outset of this transaction was simply an acknowledgment of potential mitigating circumstances with respect to his sentencing and nothing else. The government's parade of evidence amply supports Martinson's conviction, and we affirm that conviction.
 
 C. Martinson's sentence
 
 15
 Martinson claims that Judge Evans improperly computed the loss amount pursuant to United States Sentencing Commission, Guidelines Manual, Sec. 2F1.1. Under this section, a defendant's base offense level is six, but the provision mandates an increase in the offense level based upon the total amount of loss. U.S.S.G. Sec. 2F1.1(b)(1). In this case, $70,000 becomes the magic number. U.S.S.G. Sec. 2F1.1(b)(1)(G). For if the total loss is more than $40,000 but less than $70,000, the offense level is increased by five. If the loss exceeds $70,000, however, the offense level is increased by six. The district court calculated a total loss in excess of $105,000 and an offense level of twelve.[1] Martinson claims that the offenses for which he was convicted involved a total loss of less than $70,000, and his offense level, therefore, is eleven.
 
 
 16
 It is true that the government dropped one count of mail fraud on the eve of trial,[2] and that the elimination of this count dropped the loss value below $70,000. The district court, however, included in its calculation the transaction supporting this count because it constitutes relevant conduct. Application Note 6 to Sec. 2F1.1 states that "the cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction." This application note and our cases make clear that relevant conduct is an appropriate basis on which to base a defendant's sentence. In addition, we do not find that the district court's factual finding regarding this conduct is clearly erroneous. See 18 U.S.C. Sec. 3742(e). We, therefore, find that the district court properly applied the guidelines, calculated the loss value, and determined Martinson's offense level pursuant to Sec. 2F1.1.
 
 
 17
 D. The government's cross-appeal regarding Martinson's acceptance of responsibility
 
 
 18
 The government argues that the district court committed clear error when it found that Martinson accepted responsibility for his actions and, therefore, reduced Martinson's offense level by two pursuant to U.S.S.G. Sec. 3E1.1. It relies on Martinson's failure to plead guilty and his vehemence in denying any criminal intent, even after his conviction, during sentencing and on appeal to this court. We agree with the government and find that the district court's finding that Martinson accepted responsibility for his crime is clearly erroneous.
 
 
 19
 Acceptance of responsibility means that "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. Sec. 3E1.1(a). A defendant may demonstrate this by performing any number of expiatory acts. United States v. Beserra, 967 F.2d 254, 255 (7th Cir.1992); U.S.S.G. Sec. 3E1.1, comment. (n. 1). Except in rare circumstances, a plea of guilty is a necessary, if not a sufficient, condition for acceptance of responsibility. U.S.S.G. Sec. 3E1.1, comment. (n. 2). Application Note 2 states:
 
 
 20
 This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.
 
 
 21
 We must also note that even if a defendant does plead guilty, without more he is not entitled to a reduction. U.S.S.G. Sec. 3E1.1, comment. (n. 3).
 
 
 22
 As the government strongly argues, Martinson refused to plead guilty and has steadfastly maintained at every phase of this prosecution that he lacks any criminal intent. The district court based its finding on Martinson's statements that he took the money from the canneries and his acknowledgment that he still owes it to them. The district court finds further reliance on Martinson's (overblown) statement that he refuses to file for bankruptcy. But Martinson's statements regarding this whole scheme indicates that he is not a man in whom we can detect "glimmerings of conscience."
 
 
 23
 Martinson continues to blame every other party in this deal but himself. His attempts to shift the blame travel from the ridiculous to the sublime: He blames Schneringer for fouling up the deal at every turn (even though the canneries hold Martinson responsible and continue to do business with Schneringer), the canneries for refusing to ask him for the money back (if only it was that easy!), and he implicitly blames his local lending institution for forcing him to improperly convert the canneries' funds because it refused to make him a loan to renovate his bar. Martinson still claims he is innocent of criminal charges. He has never once said: "I did it; I was wrong." This is not one of those rare instances in which a defendant has put the government to its proof and may still maintain that he has accepted responsibility. Martinson has obviously not accepted responsibility for his crime and is undeserving of a reduction of his offense level.
 
 III. Conclusion
 
 24
 For the foregoing reasons, Martinson's conviction, the district court's denial of Martinson's motion to reschedule his trial and its determination under U.S.S.G. Sec. 2F1.1 is AFFIRMED. We REVERSE, however, the district court's finding that Martinson accepted responsibility for his crime, and we REMAND this matter to the district court to recalculate Martinson's sentence.
 
 
 
 *
 The Honorable James L. Foreman of the United States District Court for the Southern District of Illinois is sitting by designation
 
 
 [1]
 The district court disallowed approximately $7,500 because that transaction occurred in 1986 and, as such, was barred from consideration by the statute of limitations
 
 
 [2]
 Shortly before the commencement of Martinson's trial, the prosecutor learned that the transaction underlying Count Five of the indictment alleging mail fraud actually involved wire fraud. It decided to drop that count rather than obtain a superseding indictment. As we shall see, it did present evidence of this transaction as relevant conduct at Martinson's sentencing hearing