**UNITED STATES of America,**
**Plaintiff,**

v.

**John FORCHETTE, Defendant.**

**No. 02–CR–37.**

United States District Court,
E.D. Wisconsin.

Sept. 5, 2002.

---

Matthew L. Jacobs, Milwaukee, WI, for plaintiff.

Thomas E. Brown, for defendant.

### *MEMORANDUM*

ADELMAN, District Judge.

## I. FACTS AND BACKGROUND

On February 12, 2002, a federal grand jury indicted Bruce Bennett, the claims manager of ATC Leasing ("ATC"), a Kenosha, Wisconsin trucking company, and defendant John Forchette. The indictment alleged that Bennett defrauded ATC out of about $750,000 by creating phony accident claims and pocketing the proceeds, and that Forchette participated in the scheme by recruiting individuals to cash fraudulent checks generated by Bennett and by forging the signature of payees and negotiating checks himself.

Bennett pled guilty, but Forchette proceeded to trial. At trial, Forchette testified that Bennett, a longtime friend, asked him if he could recruit individuals to cash settlement checks for accident victims who were illegal aliens and had no bank accounts. Bennett indicated that he could settle these claims more quickly if he could provide the proceeds in cash. He stated that he would list the name of the person Forchette recruited on the check as a relative or friend of the accident victim. The recruited individual would then deposit the settlement check into his or her bank account, withdraw the cash and return it to Forchette, less a $500 payment. Forchette would also receive a $500 payment and then turn the balance of the cash over to Bennett, who would give it to the victim.

Forchette, who was the plant manger at a Chicago factory that employed many Hispanics, agreed and proceeded to inquire of employees if they wanted to cash a check in exchange for a fee. If the employee agreed, Forchette would give his or her name to Bennett, who would issue a check in the employee's name and give it to Forchette, who in turn would give it to the employee to cash. Between January and May 2001, Forchette recruited twelve employees to cash checks generated by Bennett in the total amount of $244,000. Forchette testified that he received $500 per check.

In June 2001, Forchette gave Bennett the name of an employee whom he believed had agreed to cash a check. However, when Forchette approached the employee with the check she declined to cash it. Forchette then forged the name of the employee and deposited the check into his own bank account, withdrew the money, paid himself between $500 and $1500, and returned the balance to Bennett. Forchette negotiated twenty-two additional checks in similar fashion.

At trial, Forchette admitted to the above-described conduct. However, he denied knowing that Bennett was pocketing the money that Forchette returned to him. He testified that he believed that the checks constituted the proceeds of real accident claims, and that he was helping illegal alien accident victims while making

a little money for himself and the employees he recruited. He stated that he would never have engaged in such conduct had he known that Bennett was simply stealing from his employer.

The jury convicted Forchette of five counts of interstate transportation of securities obtained by fraud based on the checks he took from Wisconsin to Illinois to be cashed by others, and five counts of bank fraud based on the forged checks he negotiated at his bank. I entered judgment on the verdict, and a pre-sentence report (PSR) was prepared. Because the 2000 edition of the United States Sentencing Guidelines Manual was more favorable to Forchette than the 2001 edition, the report was based on the earlier version.

Forchette's base offense level under U.S.S.G. § 2F1.1, the fraud guideline, was six. The "amount of loss" was determined to be $464,300, based on $244,000 in checks cashed by individuals he recruited and $220,300 in checks that he negotiated, resulting in an increase of nine levels under the loss table in § 2F1.1. The PSR added two levels under U.S.S.G. § 2F1.1(b)(2)(A) because the offense involved "more than minimal planning" and four levels under § 3B1.1(b) because defendant was an "organizer or leader" of criminal activity involving five or more participants. Because he went to trial, he was not awarded a reduction for acceptance of responsibility under § 3E1.1. Thus, his offense level was determined to be 21. Because Forchette had no prior record his criminal history category was I, producing an imprisonment range of thirty-seven to forty-six months.

Forchette filed objections to the PSR. He argued that he should not receive enhancements for more than minimal planning or for being a leader or organizer, and that he should receive a two level

reduction for acceptance of responsibility. After reviewing the PSR and the objections, I advised the parties that I was considering a downward departure under U.S.S.G. § 2F1.1 cmt. n. 8(b) & 11 based on the amount of loss significantly overstating the seriousness of defendant's conduct. After hearing argument, I concluded that defendant should not receive the four level enhancement for role in the offense but overruled his other objections. I also concluded that a two level downward departure was warranted. With an adjusted offense level of 15, I sentenced defendant to eighteen months in prison, followed by five years of supervised release, a special assessment of $1000 and restitution in the amount of $464,300, joint and several with Bennett.

In this memorandum I set forth the bases for my decision.

## II. DISCUSSION

### A. Defendant's Objections to the PSR

#### 1. More Than Minimal Planning

The first issue was whether defendant should receive a two level enhancement under U.S.S.G. § 2F1.1(b)(2)(A) for "more than minimal planning." Defendant noted that this enhancement was abolished in the 2001 guidelines. He then argued that the enhancement was not warranted here because his scheme was not more complex than the typical fraud case.

Section 2F1.1(b)(2) states: "If the offense involved (A) more than minimal planning ... increase by two levels." Defendant is correct that the enhancement does not exist under the 2001 fraud guideline, § 2B1.1. However, as the government correctly noted at sentencing, the enhancement has not really been abolished. Rather, in recognition of the fact that it was applied in more than eighty percent of fraud cases,[1] the Commission simply incor-

---

1. *See* Roger W. Haines et al., *Federal Sentenc* *ing Guidelines Handbook* 569 (2001).

porated it into the § 2B1.1 loss table, obviating the need for judicial fact-finding and avoiding the potential overlap with the "use of sophisticated means" enhancement. *United States Sentencing Commission Guidelines Manual Supplement to Appendix C* 181 (2001) (amendment 617). But because the 2000 guidelines applied, the enhancement was permitted here.

■ This enhancement may be applied if the defendant engaged in " 'more planning than is typical for commission of the offense in a simple form,' " took " 'significant affirmative steps ... to conceal the offense' " or engaged in " 'repeated acts over a period of time, unless it is clear that each instance was purely opportune.' " *United States v. Archuletta*, 231 F.3d 682, 684 (10th Cir.2000) (quoting USSG § 1B1.1 cmt. n. 1(f)). These three definitions operate in the alternative. Thus, even if the defendant's scheme did not involve more planning than is typical, he may receive the enhancement if the crime involved repeated acts over a period of time that were not purely opportune. *United States v. Doherty*, 969 F.2d 425, 430 (7th Cir.1992); *see also United States v. Mau*, 45 F.3d 212, 214 (7th Cir.1995).

■ I concluded that the enhancement applied here because defendant's conduct involved repeated acts over a period of time that were not purely opportune. He received twelve fraudulent checks between January and May of 2001 and fraudulently endorsed twenty-two more checks between June and October of 2001. *Cf. United States v. Rust*, 976 F.2d 55, 57 (1st Cir. 1992) (holding that defendant's submission of twenty-three forged travel expense vouchers, although simple in execution, involved repeated acts over a several year period and could not be characterized as purely opportune).

## 2. Role in the Offense

Defendant next objected to being assessed a four level enhancement for role in the offense, arguing that he did not supervise the criminal conduct of others as required by U.S.S.G. § 3B1.1(b). Section 3B1.1(a) permits a four-level adjustment "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Pursuant to application note 4 of § 3B1.1,

Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

The court "weighs these factors 'in light of the Guidelines' intent to punish with greater severity leaders and organizers of criminal activity.' " *United States v. Mijangos*, 240 F.3d 601, 604–05 (7th Cir.2001) (quoting *United States v. Sierra*, 188 F.3d 798, 804 (7th Cir.1999)). No single factor is essential. *See United States v. Fones*, 51 F.3d 663, 665 (7th Cir.1995).

■ Although the criminal activity here involved more than five participants, I concluded that the enhancement should not be imposed. First and most importantly, defendant did not exercise decision-making authority in the manner contemplated by the guidelines. As the ATC claims manager Bennett devised the scheme of generat-

ing false claims checks. Initially, he used two attorneys to pass phony checks; subsequently, he enlisted defendant to help him negotiate checks. Defendant's role was to recruit individuals to pass the checks Bennett generated; defendant accomplished this task by approaching employees at his workplace and asking if they wanted to make some money in return for cashing a check.

The proposed § 3B1.1 enhancement was based on defendant's conduct with the employees he recruited. The PSR stated that defendant controlled these individuals, and that as plant manager he could choose whom to recruit and exercise influence over them.

■ However, I concluded this was not the type of control contemplated by the guidelines. The enhancement does not apply to a defendant who manages a business or property used in the fraud. *See United States v. Schuh*, 289 F.3d 968, 972 (7th Cir.2002); *Fones*, 51 F.3d at 670. The fact that defendant controlled these employees in their work duties does not mean that he controlled their criminal activities.

The evidence did not show that defendant directed the employees in connection with criminal conduct. Bennett told defendant what to ask the employees to do, and defendant relayed those instructions. Defendant did not tell employees that they had to cash checks nor how or where to cash them. Moreover, if they declined he moved on; he did not threaten or coerce them. Application note 4 states that the "adjustment does not apply to a defendant who merely suggests committing the offense." Defendant did no more than suggest to employees that they could make some money by cashing checks.

Second, the nature of defendant's participation was not that of a leader or organizer. He did what Bennett asked him to do, acting essentially as a middle man for a portion of Bennett's fraud. *See Schuh*, 289 F.3d at 973 (holding that being a middleman is insufficient for a § 3B1.1 adjustment).

Third, while defendant did recruit other participants, this factor alone is insufficient absent the exercise of control.[2] Fourth, defendant did not claim a larger share of the proceeds than those he recruited, but instead took a small fee and turned the lion's share of the money over to Bennett. Defendant testified, in my view credibly, that he took $500 per check, the same as the employees who cashed them. Thus, he and the employees more or less "equally benefitted." *See Schuh*, 289 F.3d at 973 (citing *United States v. Mustread*, 42 F.3d 1097, 1105 (7th Cir.1994)).

Fifth, defendant played no part in planning or organizing the scheme; Bennett did that. Sixth, the nature and scope of the illegal activity extended well beyond his role. Bennett's scheme created a loss of about $759,000, and he used others besides defendant to further it. Seventh, defendant did not control the employees who participated and did not trade on his authority as plant manager to obtain their involvement.

Thus, only one of the seven factors listed in application note 4 was present to any appreciable degree. But more simply put, defendant's conduct was not the type to which the leader or organizer enhancement was intended to apply.

*United States v. Mijangos*, which involved a somewhat similar scheme, provides an example of the type of defendant

**2.** As the Seventh Circuit has noted, "generally, those recruited are subordinate to the recruiter." *Fones*, 51 F.3d at 670 n. 5. However, in this case the evidence did not establish that defendant controlled those he recruited.

who should receive the enhancement. Mijangos was a member of a criminal enterprise that recruited illegal immigrants to cash counterfeit checks in various states. 240 F.3d at 602. He provided immigrants with false identification cards and counterfeit checks and directed them to travel to Alabama, Rhode Island and Wisconsin to cash the checks. The checks were to be negotiated on certain days at specific places such as stores, check cashing establishments, pawn shops and banks. Based on his provision of materials, specific directions on when, where and how to cash the checks, and the fact that he received fifty percent of the proceeds of each check, a § 3B1.1 enhancement was affirmed. *Id.* at 605.

For all of these reasons, I declined to impose the § 3B1.1 enhancement. Defendant's adjusted offense level was 17.

### 3. Acceptance of Responsibility

Finally, defendant objected to not receiving a two level reduction for acceptance of responsibility under § 3E1.1. He argued that although he went to trial he admitted all of his conduct, making this one of the rare cases in which the reduction can co-exist with the decision to go to trial.

Section 3E1.1(a) states: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."

According to application note 1:

In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:

(a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to

volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;

(b) voluntary termination or withdrawal from criminal conduct or associations;

(c) voluntary payment of restitution prior to adjudication of guilt;

(d) voluntary surrender to authorities promptly after commission of the offense;

(e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(f) voluntary resignation from the office or position held during the commission of the offense;

(g) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

(h) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

Application note 2 indicates:

This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This

may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). *See United States v. Purchess,* 107 F.3d 1261, 1267 (7th Cir.1997) (stating that a defendant should not lose the reduction where he admits all of the necessary facts but contests the legal effect of those facts).

■ After carefully considering the position taken by defendant at trial, I concluded that he should not receive the reduction. Defendant was charged with five counts of interstate transportation of falsely made checks. This offense has four elements: (1) the defendant transported a check in interstate commerce; (2) the check had a value of at least $5,000; (3) the check was taken by fraud; and (4) at the time the defendant transported the check, he knew that it had been obtained by fraud. *Federal Criminal Jury Instructions of the Seventh Circuit* 362 (1999); *see* 18 U.S.C. § 2314.

At trial defendant either admitted or did not contest the first three elements. However, he attempted to contest the fourth element, testifying that he believed that the checks he transported represented the proceeds of genuine accident settlements. He indicated that he did not know Bennett was simply making up claims in order to steal money from his employer.

Defendant was also charged with five counts of bank fraud. Bank fraud has five elements: (1) that there was a scheme to defraud a bank or to obtain money owned by, or in the custody or control of, a bank by means of false or fraudulent pretenses or representations; (2) that the fraud contained a material deception or material false or fraudulent representation; (3) that the defendant executed the scheme; (4) that the defendant did so knowingly and with the intent to defraud; and (5) that at

the time of the charged offense the deposits of the bank were insured by the Federal Deposit Insurance Corporation. *See Federal Criminal Jury Instructions of the Seventh Circuit* 267 (1999); *see also* 18 U.S.C. § 1344; *Neder v. United States,* 527 U.S. 1, 4, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that materiality is an element of bank fraud).

It is unclear what defendant's defense was to the bank fraud charges. He admitted to negotiating forged checks, and that he knew it was wrong to do so. At one point, defendant's counsel attempted to stop cross-examination concerning these counts by raising the Fifth Amendment. Perhaps the theory was that defendant did not intend to defraud the banks because the underlying claims were legitimate and the checks would be paid, although this was never made clear.

In any event, what defendant seemed to be claiming, both with respect to the interstate transportation and bank fraud charges, was that he lacked the intent or mental state necessary to commit the offenses. Some courts have held that where the defendant in good faith goes to trial to contest the legal element of intent, but admits to all of the conduct with which he is charged, he may receive the reduction for acceptance of responsibility. *United States v. Gauvin,* 173 F.3d 798, 806 (10th Cir.1999) (holding that defendant may receive the reduction where he admitted to striking police squad car with his truck during a chase but denied that he did so with the intent to cause harm); *see United States v. Corral–Ibarra,* 25 F.3d 430, 440 (7th Cir.1994) (stating "that an entrapment defense, if pleaded in good faith, also may possibly qualify" for the reduction); *United States v. Fleener,* 900 F.2d 914, 917–18 (6th Cir.1990) (holding that trial defense of entrapment, which focuses on the defendant's intent and predisposition to commit

the crime, does not bar a reduction for acceptance of responsibility); *see also United States v. Fells*, 78 F.3d 168, 171–72 (5th Cir.1996) (holding that defendant in felon in possession case may receive the reduction where he did not deny the underlying facts at trial but argued that they did not legally constitute possession in the charging district); *United States v. Barris*, 46 F.3d 33, 35–36 (8th Cir.1995) (holding that use of insanity defense at trial did not bar reduction for acceptance). *Cf. United States v. Rector*, 111 F.3d 503, 508 (7th Cir.1997), *overruled on other grounds by United States v. Wilson*, 169 F.3d 418, 428 n. 9 (7th Cir.1999) (holding that "the adjustment is rarely available to those who assert entrapment"). *But see United States v. Kirkland*, 104 F.3d 1403, 1405–06 (D.C.Cir.1997) (affirming denial of reduction for acceptance where defendant raised an entrapment defense, which the court considered a challenge to an element of factual guilt).

In *United States v. Ervasti*, 201 F.3d 1029, 1043 (8th Cir.2000), where the defendant claimed not to have had the intent to defraud, the court stated:

> The fundamental inquiry under § 3E1.1(a) is whether the defendant "clearly demonstrates" acceptance of responsibility for "his offense." When a defendant denies having the requisite mental state for the crime for which he was convicted, a district court is well within its discretion to determine that the defendant has failed to "clearly demonstrate[ ] acceptance of responsibility for *his offense*." Id. § 3E1.1(a) (emphasis added); *see United States v. Makes Room*, 49 F.3d 410, 416 (8th Cir.1995) (upholding district court's denial of § 3E1.1(a) reduction where defendant admitted to facts underlying conviction but denied having requisite mens rea of the offense of conviction).

Similarly, in *United States v. Crass*, 50 F.3d 81, 84 (1st Cir.1995), the court noted that intent, like any other element of the crime charged, may not be contested by the defendant without jeopardizing a downward adjustment for acceptance of responsibility. *See also United States v. Bennett*, 37 F.3d 687, 696–97 (1st Cir. 1994).

In the Seventh Circuit, a defendant who goes to trial and denies criminal intent is not categorically precluded from receiving a reduction but faces an uphill battle. *See United States v. Williams*, 202 F.3d 959, 962 (7th Cir.2000) ("If a defendant challenges factual evidence of guilt as well as legal principles, however, he typically will be ineligible to receive the acceptance of responsibility reduction."). In *Williams*, the court affirmed denial of the reduction to a defendant who claimed not to have known that the box he was carrying contained drugs. *Id.* at 963. And in *United States v. Martinson*, 37 F.3d 353, 357–58 (7th Cir.1994), a mail and wire fraud case, the court reversed a two level reduction for a defendant who went to trial and was convicted but denied possessing criminal intent and continued to maintain his innocence. These cases make clear that the reduction should rarely be given to a defendant who contests mens rea.

In the present case I concluded that the reduction was not appropriate. I first noted that it was defendant's burden to establish entitlement to the reduction. *United States v. Tankersley*, 296 F.3d 620, 622 (7th Cir.2002). I then reviewed the pertinent factors under § 3E1.1.

First, defendant did not show that his defense at trial was a challenge to the legal conclusion to be drawn from undisputed facts, rather than a challenge to a factual element of the offense. Therefore, it did not fit within the exceptions listed in application note 2. *Cf. Williams*, 202 F.3d

at 962 (noting that the defendant made no representations before or during trial that he wished to challenge only the legal standard under which he was being prosecuted).

Neither did he show that this was one of the "rare" cases where a defendant can challenge the element of intent yet obtain benefit of the reduction. *See Gauvin,* 173 F.3d at 806. In light of defendant's admissions on the witness stand, it is difficult to regard his decision to go to trial and contest mens rea as a reasonable one. Even accepting as credible, as I do, defendant's testimony that he did not understand the true nature of Bennett's scam, defendant admitted committing crimes. He admitted transporting checks from Wisconsin to Illinois that he knew were fraudulent; he knew this because he supplied the names of the payees on the checks—individuals who were not real accident victims. Similarly, his trial position that even though he negotiated forged checks he was nevertheless not guilty of bank fraud was unreasonable. His refusal (or inability) to admit to *breaking the law,* despite admitting his conduct, constituted refusal to accept responsibility in the most basic sense. *See United States v. Lopinski,* 240 F.3d 574, 575–76 (7th Cir.2001).[3]

Second, defendant did not point to any pre-trial "words or actions" demonstrating acceptance of responsibility. *Corral–Ibarra,* 25 F.3d at 442; *see also United States v. Clay,* 37 F.3d 338, 343 (7th Cir.1994) ("In fact, before us he has pointed to no instance prior to his trial in which he overtly demonstrated any true acceptance of responsibility. . . ."). Third, defendant did not show that he voluntarily terminat-

ed or withdrew from the criminal conduct. Fourth, he did not show that he voluntarily paid any restitution prior to adjudication of guilt. Fifth, he did not show that he assisted authorities in the recovery of the fruits of the offense. Finally, while his post-conviction version of the offense expressed remorse for poor judgment, such statements are of little value in this determination. Therefore, for all of these reasons, I found that defendant was not entitled to the reduction.

**B. Downward Departure**

**1. General Principles**

Application notes 8(b) and 11 of § 2F1.1 provide that where the amount of loss significantly overstates the seriousness of the defendant's conduct a downward departure may be warranted.[4] In the present case the loss was determined to be $464,300, comprised of $244,000 in checks negotiated by third parties recruited by defendant and $220,300 in checks endorsed and negotiated by defendant himself. The base offense level for fraud under § 2F1.1 is six, and additional levels are added based on the amount of loss. Nine levels are added where, as here, the amount of loss was between $350,000 and 500,000. Thus, defendant's offense level based on the § 2F1.1 loss table was 15. This calculation was not in dispute.

However, the court may "depart from the applicable Guideline range if 'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should re-

---

**3.** By going to trial, defendant also failed to save the court and the government the time, expense and effort of a trial, another purpose of section 3E1.1. *See, e.g., United States v. Bonanno,* 146 F.3d 502, 512–13 (7th Cir. 1998). Going to trial was defendant's right,

however he did so at the expense of the § 3E1.1 reduction.

**4.** This provision is currently found at U.S.S.G. § 2B1.1 cmt. n. 15(B).

sult in a sentence different from that described.'" *Koon v. United States,* 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (quoting 18 U.S.C. § 3553(b)). The Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "encouraged" bases for departure, and "discouraged" bases for departure. *Id.* at 93–95, 116 S.Ct. 2035

The Supreme Court has thus adopted the following test for determining whether to depart: (1) What factors of the case make it special or unusual? (2) Has the Commission forbidden departures based on those factors? (3) If not, has the Commission encouraged departures based on those factors? (4) If not, has the Commission discouraged departures based on those factors? *Id.* at 95, 116 S.Ct. 2035.

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035 (citations and internal quote marks omitted).

In the present case, the factor that potentially took the case out of the guidelines' heartland was the high amount of loss attributed to defendant. The question was whether the loss amount significantly overstated the seriousness of his conduct. If so, this is "an encouraged basis for departure." *United States v. Corry,* 206 F.3d 748, 751 (7th Cir.2000); *see also United States v. Lane,* 194 F.Supp.2d 758, 775 (N.D.Ill.2002). A review of the cases and commentary indicates that there are four basic situations in which such a departure may be appropriate.

#### a. The "Multiple Causation" Scenario

First, the amount of loss may be the product of several sources, in addition to the defendant's conduct. *United States v. Rostoff,* 53 F.3d 398, 406–08 (1st Cir.1995) (affirming downward departure to reflect "multiple causation" for victim loss); *see also United States v. Morris,* 80 F.3d 1151, 1172–74 (7th Cir.1996); *United States v. Miller,* 962 F.2d 739, 744 (7th Cir.1992) (citing *United States v. Carey,* 895 F.2d 318, 322 (7th Cir.1990) & *United States v. Kopp,* 951 F.2d 521, 531 (3d Cir.1991)). In such a case it would be unfair to sentence the defendant based on a loss amount inflated by factors, such as an economic downturn, a market collapse, or negligence by the victims, which are beyond his control.

#### b. The "Economic Reality" Principle

Second, the loss determination may produce a gross disparity between the probable or actual loss and the defendant's intended loss. *See, e.g., United States v. Stockheimer,* 157 F.3d 1082, 1089–92 (7th Cir.1998). Under § 2F1.1, courts determine loss based on the higher of the actual or the intended loss. *Id.* at 1089. But in some cases, as where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence based on

the intended (but highly improbable) loss determination from the § 2F1.1 table; the intended loss bears no relation to "economic reality." *Id.; see also* U.S.S.G. § 2F1.1 cmt. n. 11 (2000) (providing as an example for downward departure a case where a defendant presents an obviously flawed instrument that no one would seriously consider honoring).

### c. Unusual Conduct or Role

Third, the unusual nature of the fraudulent conduct or of the defendant's role in it may provide a basis for a departure. For example, the defendant may have had a limited or inferior role in the fraud that bore little relationship to the amount of the loss; he may have had little or no knowledge of the amount being taken, such that it would be unfair to attribute the entire amount of loss to him; his intent in involving himself in the scheme may have been significantly different than of the usual fraud defendant, e.g. he may have entered the scheme with honest intentions or with the intent to make good on his obligations; his fraudulent representation may have been of limited materiality, as where he could have obtained a loan by truthful means but at a higher interest rate; or the defendant's fraud may have been for little or no gain, especially in comparison to the size of the loss. *See, e.g., United States v. Brennick,* 134 F.3d 10, 13 (1st Cir.1998); *Morris,* 80 F.3d at 1172–74; *United States v. Broderson,* 67 F.3d 452, 459 (2d Cir.1995); *United States v. Monaco,* 23 F.3d 793, 799 (3d Cir.1994); *United States v. Stuart,* 22 F.3d 76, 82 (3d Cir.1994); *United States v. Nachamie,* 121 F.Supp.2d 285, 295–97 (S.D.N.Y.2000), *aff'd,* 5 Fed.Appx. 95 (2d Cir.2001); *United States v. Costello,* 16 F.Supp.2d 36, 39–40 (D.Mass.1998); *United States v. Jackson,* 798 F.Supp. 556, 557 (D.Minn.1992); *see also United States v. Restrepo,* 936 F.2d 661, 667 (2d Cir.1991).

### d. Extraordinary Restitution or Remedy

Finally, the defendant's efforts at remedying the wrong, as where he had sufficient unpledged assets to cover the loss in a fraudulent loan case or made extraordinary restitution, may justify a downward departure. *See, e.g., United States v. Oligmueller,* 198 F.3d 669, 671–72 (8th Cir. 1999); *cf. United States v. Bean,* 18 F.3d 1367, 1369 (7th Cir.1994) (holding that a court may depart under § 5K2.0 to reward extraordinary and prompt restitution); *United States v. Carey,* 895 F.2d 318, 323 (7th Cir.1990) (same). This is especially so where the defendant has made full or nearly full restitution prior to being charged.

### 2. Defendant's Conduct and Role Were Unusual

██ I concluded that defendant fell into the third category and that several unusual factors caused the loss determination to overstate the seriousness of his conduct. First, the scheme in which he participated was masterminded by Bennett. *See Costello,* 16 F.Supp.2d at 38 (granting downward departure where defendants "did not come up with the scheme at the outset"). Defendant's initial role in the scheme was essentially that of a middle man—he recruited people to cash the phony checks Bennett produced and carried the checks to the individuals recruited. Bennett decided on the amount of the checks and produced the checks; therefore, he controlled the amount of loss produced, not defendant.

The situation is analogous to that in *Stuart,* where the defendant was paid $2000 to transport $129,000 worth of stolen government bonds. Although the court concluded that the defendant was properly tagged with $129,000 as the amount of loss under § 2B1.1, it stated:

Nevertheless, we are left with the definite impression that, notwithstanding the proper application of the Guidelines, a nine-level enhancement under these circumstances may well overstate both the degree of Stuart's criminality and his need to be corrected. At most, Stuart agreed to deliver stolen bonds on two occasions, for a total payment of $ 2,000. If on remand Stuart requests a downward departure, the district court may well find there to be little relationship between Stuart's role in the offense and the value of the stolen property he was carrying.

22 F.3d at 82. The court then stated: "Where application of the Guidelines' monetary tables bears little or no relationship to the defendant's role in the offense, and greatly magnifies the sentence, the district court should have the discretion to depart downward." *Id.* at 83. The court thus remanded for consideration of a downward departure. In the present case, defendant was also paid a minimal fee to transport checks "stolen" by someone else.

Even after the scheme changed, and defendant began negotiating the checks directly, the amount of loss was still driven by Bennett. Bennett decided the amounts of the checks. Thus, while defendant's participation was necessary to enable Bennett to obtain the money, Bennett's actions determined the extent of the loss. Similarly, in *Jackson,* the defendant's phony real estate appraisal was a necessary part of the fraudulent loan scheme, but the court nevertheless concluded that a downward departure was appropriate under § 2F1.1 cmt. n. 11 because the "actions of other persons involved in the loan transactions aided substantially and caused the loss." 798 F.Supp. at 557.

Second, defendant's share of the proceeds was consistently minimal, certainly in comparison to the total amount of loss.

According to his testimony, he received $500 to $1500 per check. I found this testimony credible. Thus, his "profit," based on the thirty-six checks involved, was between $18,000 and $54,000.[5] Yet the amount of loss was $464,300, a gross disparity. *See Costello,* 16 F.Supp.2d at 39 (granting downward departure based on the extent of the disproportion between the loss to the victim and the gain to the defendant); *see also Stuart,* 22 F.3d at 80–81 (suggesting downward departure where defendant made $2000 but was assessed with $129,000 loss).

The government did not present evidence suggesting that defendant's testimony understated his benefit. There was no indication that defendant spent freely or purchased luxury items. The PSR posited that because defendant forged $220,300 in checks and wrote checks back to Bennett for only $112,000 he may have received more than he claimed. However, defendant may well have given the money to Bennett in cash. In any event, there was no evidence to support this supposition. Thus, defendant's limited gain in comparison to the amount of loss also made this case unusual.

I acknowledge that *United States v. Seacott,* 15 F.3d 1380, 1387 (7th Cir.1994) held that lack of a personal profit motive in a fraud case was a legally insufficient reason to depart downward. However, *Seacott* preceded *Koon,* and as Judge Flaum has explained, *Koon* held that " 'for the courts to conclude a factor must not be considered under any circumstances would be to transgress the policymaking authority vested in the Commission.' " *Corry,* 206 F.3d at 752 (quoting *Koon,* 518 U.S. at 106–07, 116 S.Ct. 2035) (Flaum, J., concurring). "Failure to profit is not a ground expressly forbidden by the Commission. *See* U.S.S.G. Ch. 1, Pt. A 4(b). Thus, to

---

**5.** At sentencing, defendant's counsel indicated that defendant's profit was about $32,000.

the extent that our decision in *Seacott* precluded district courts from considering personal profit motive as a basis for departure, it has been superseded by the *Koon* analysis."[6] *Id.*[7]

Finally, defendant did not fully understand the nature and scope of Bennett's activity. Defendant's testimony on this point was uncontradicted and credible. Defendant did not know that by negotiating the checks he received from Bennett he was helping Bennett steal $464,300 from his employer.

In *Nachamie*, Judge Scheindlin departed downward in a fraud case based on similar concerns. Referring to them as "accidental criminals," she noted that the defendant doctors did not enter the Medicare scheme concocted by their employer with criminal intent. 121 F.Supp.2d at 296. When hired, they were told that the clinic's activities were legitimate, and the details of the scheme were kept from them. However, even though they "may not have been savvy," Judge Scheindlin found that once they began to review patient charts and remittance statements, "they must have suspected the fraudulent nature of the scheme almost immediately." *Id.* Thus, "they became criminals rather than victims, albeit by accident rather than design." *Id.* at 296–97.

Judge Scheindlin then departed downwardly, stating: "The fact that defendants did not join Nachamie's scheme with criminal intent—and then operated for an additional period of time with 'diminished' intent—makes this an 'atypical' case that 'significantly differs from the norm' and therefore falls outside the 'heartland' of the fraud Guidelines." *Id.* at 297 (quoting U.S.S.G., Ch.1, Pt. A, comment 4(b)); *see also Broderson,* 67 F.3d at 459 ("Although Broderson was charged and sentenced for fraud, his criminal intent was significantly different from that of the typical fraud defendant. He did not set out to mislead the government."); *Monaco,* 23 F.3d at 799 (holding that departure could be appropriate where defendant lacked usual intent to defraud or steal). In the present case as well, defendant's "diminished intent" made a departure appropriate.

### 3. Government's Objections

The government opposed the departure arguing first, based on *Morris,* 80 F.3d at 1174, that application note 8(b) only addresses situations "when a misrepresentation is of limited materiality or is not the sole cause of a loss." However, *Morris* was decided under application note 11, a prior and slightly different version of note 8(b).[8] Further, in *Morris* the Seventh Circuit did no more than affirm the district

---

**6.** *Seacott's* holding that a court may not depart in order to better enable the payment of restitution would seem to suffer from a similar infirmity. 15 F.3d at 1389.

**7.** In *Corry*, the court characterized as "sound" a two level downward departure based on a loss determination that overstated the seriousness of the criminal conduct. *Id.* at 751. However, the court determined that because the defendant had personally benefitted when she committed bank fraud in order to keep a family business afloat she was not entitled to an additional departure based on lack of personal gain. *Id.* at 751 (majority) & 752 (Flaum, J., concurring).

**8.** The provision in question began as application note 11 of § 2F1.1, was recast as note 7(b), and then as note 8(b) of § 2F1.1. *See generally United States v. Krilich,* 257 F.3d 689, 691 (7th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002). The provision now appears at U.S.S.G. § 2B1.1 cmt. n. 15(B), and simply states: "Downward Departure Consideration. There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." Note 15(B) does not list the specific examples found in notes 8(b) and 11 of the 2000 version of the guidelines.

court's discretionary decision not to depart based on its finding that the amount of loss did not, in fact, overstate the seriousness of the offense. *Id.*

The government also argued that, for several reasons, note 8(b) does not authorize a departure based on the circumstances present here. First, citing *United States v. Lopez*, 222 F.3d 428, 436 (7th Cir.2000), *cert. denied*, 532 U.S. 971, 121 S.Ct. 1601, 149 L.Ed.2d 468 (2001), the government asserted that the note only applies in fraudulent loan application and contract procurement cases, not in cases such as this where the defendants simply took the victim's money.

But note 8(b) and its predecessors, notes 7(b) and 11, have been considered in cases not involving fraudulent loan applications. *See, e.g., United States v. Krilich*, 159 F.3d 1020, 1031 (7th Cir.1998) (stating, in RICO and fraud case arising out of scheme to obtain public financing for construction projects, that a "departure might be justified under Application Note 7(b)"); *Stockheimer*, 157 F.3d at 1092 (reversing and remanding for consideration of downward departure in mail and bank fraud case where amount of loss significantly overstated seriousness of criminal conduct); *United States v. Saunders*, 129 F.3d 925, 933 (7th Cir.1997) (stating, in mail fraud case, "Application Note 7(b) allows a district court to depart downward from the applicable guidelines range if it determines that the amount of loss overstates the seriousness of the offense."); *Morris*, 80 F.3d at 1174 (affirming district court's discretionary decision not to depart downward under note 11 because the loss amount did not overstate the seriousness of the offense in a mail and wire fraud case).

Moreover, *Lopez* did not address downward departures under note 8(b) or any other provision. Rather, the issue there was the amount of loss. 222 F.3d at 436.

Citing note 8(b), the defendant there argued that the loss amount should be reduced " 'by the amount the lending institution has recovered or can be expected to recover.' " *Id.* The court rejected the argument, stating that note 8(b) did not exist under the applicable guidelines (the 1989 edition). The court recognized that note 10 of the 1989 guidelines permitted consideration of the possibility that a loss amount could overstate the seriousness of a "fraudulent loan scheme" but that such an adjustment was not applicable there because the defendant "simply took and used [the victim's] money outright." *Id.*

Thus, the *Lopez* court did not consider the provisions at issue here, notes 8(b) and 11 of the 2000 version of the guidelines. But more importantly, *Lopez* did not consider the *issue* presented here—whether the amount of loss overstated the seriousness of the offense such that a downward departure was appropriate. A finding that the seriousness of the defendant's conduct has been overstated provides no basis to reduce the loss determination; rather, it is a factor "in the decision whether to depart downward." *United States v. Coffman*, 94 F.3d 330, 337 (7th Cir.1996); *see also Stockheimer*, 157 F.3d at 1089 (citing *United States v. Downs*, 123 F.3d 637, 644 (7th Cir.1997)). In *Lopez* the defendant did not seek a downward departure and the court did not consider one. This case is simply inapposite.

Second, the government argued that none of the concerns addressed by note 8(b) were raised in the present case, i.e., this was not a case where defendant's conduct was only a minor contributing factor in the loss or where other factors unrelated to the scheme inflated the loss. Rather, it argued that defendant's conduct was a direct cause of the loss, and that the loss determination was based only on checks with which he was involved.

But, as I have discussed, there are several scenarios in which the amount of loss may overstate the seriousness of the offense. The first is the so-called "multiple causation" scenario referred to by the government, where the loss is the product of external sources such as an economic downturn or the conduct of the victim. *See, e.g., Rostoff,* 53 F.3d at 406–08. This is not such a case. Second, the loss determination may produce a gross disparity between the actual loss and the intended loss, the so-called "economic reality" principle. *See, e.g., Stockheimer,* 157 F.3d at 1089–92. This principle is also inapplicable here. A third scenario is where the defendant's efforts to alleviate the fraud are extraordinary. *See, e.g., Bean,* 18 F.3d at 1369. That is also not this case.

Finally, the unusual nature of the fraudulent conduct itself or of the defendant's role in it may provide a basis for a departure. *See, e.g., Stuart,* 22 F.3d at 83; *Nachamie,* 121 F.Supp.2d at 295–97. For the reasons discussed, this is the basis for departure in the present case. Even though the loss was limited to the checks with which defendant was personally involved, his role was nevertheless limited in four important ways. First, he did not devise the scheme. Second, defendant did not steal or draft the checks and thus did not determine the amount of loss. Third, his gain was grossly disproportionate to the amount of loss. And fourth, he was unaware of the nature and scope of the scheme and was thus less culpable than the typical participant in a half-million dollar fraud case.

The government next argued that the facts of the present case were unlike those in the example in application note 11, i.e., where a defendant presents an instrument so obviously flawed that no one would honor it. However, the examples provided in notes 8(b) and 11 were not intended to be

exclusive, and the cases cited by the government do not hold otherwise. *United States v. Geevers,* 226 F.3d 186, 195–96 (3d Cir.2000) simply stated that the impossibility of a scheme should not be considered in calculating loss, but rather should be considered, if at all, in a downward departure under note 11.[9] *Geevers* did not imply that the example in note 11 was the only permissible basis for a departure or that a departure based on the present facts would be improper. *United States v. Titchell,* 261 F.3d 348, 354 n. 5 (3d Cir.2001) simply cited *Geevers* for the same proposition.

In *United States v. LeRose,* 219 F.3d 335 (4th Cir.2000) the district court had granted a downward departure based on its finding that the victim-bank's own conduct contributed to the loss it sustained in the defendant's check-kiting scheme, and because the defendant had entered into a settlement agreement with the bank for repayment. The appellate court reversed, stating that there was no evidence that the bank's actions contributed to the loss, *id.* at 339, the case bore no resemblance to the example provided in note 11 (although it did not state that a departure could be granted only on facts matching the example), *id.,* and that there was nothing extraordinary about the defendant's agreement to make restitution. *Id.* at 341. *LeRose* thus presented three of the four scenarios I have discussed—"multiple causation," "economic reality," and "extraordinary restitution"—but not the one justifying the departure here.

Finally, the government cited *United States v. Carey,* where the court rejected a departure based in part on the defendant's payment of restitution. 895 F.2d at 322. The court stated that the commentary to § 2F1.1 "implies that a downward departure is warranted only in the rare situation

9. This is the same point the Seventh Circuit made in *Coffman,* 94 F.3d at 337

where the defendant should not be held responsible for the entire loss due to extrinsic reasons beyond his control." *Id.* at 323. The court noted that the defendant's actions were the sole cause of the loss and that payment of restitution was already taken into account in § 3E1.1 and thus should not, absent unusual circumstances, have been used as a basis for departure. *Id.* at 323.

However, *Carey* is distinguishable for several reasons. First, it is a pre-*Koon* case. Therefore, any suggestion that certain factors other than those expressly named by the Commission may *never* be a basis for departure has been superseded. *See Koon*, 518 U.S. at 106–07, 116 S.Ct. 2035. Second, *Carey* involved the "extraordinary restitution" scenario, which is rarely an appropriate basis for departure. Finally, in the present case, defendant was *not* the sole cause of the loss, and, for the reasons stated, his responsibility for the extent of the loss was limited. Therefore, *Carey* does not preclude a departure here.

### 4. Consideration of Section 3553(a) Factors and Extent of Departure

For the reasons stated, I concluded that I was authorized to downwardly depart. However, in determining whether and to what extent to depart I considered the factors set forth in 18 U.S.C. § 3553(a), including: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide for the defendant's rehabilitative needs; (3) the kinds of sentences available; (4) any pertinent policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to the victims of the offense.

▮ I concluded that the above factors supported a modest departure. Defendant's offense was serious and required a period of imprisonment to promote respect for the law and to deter others from similar conduct. Because defendant was forty-eight years old, did not have any criminal record and because his conviction appeared to have affected him profoundly, I concluded that he was not a threat to the public. I also found that a reduced prison term would benefit the victims because it would enhance defendant's ability to pay restitution.

▮ Thus, I departed downwardly by two levels. Once a court decides to depart the extent of the departure is a matter within the court's discretion and will be upheld so long as it is reasonable and adequately reflects the structure of the guidelines. *United States v. Cruz–Guevara*, 209 F.3d 644, 647 (7th Cir.2000); *see also* 18 U.S.C. § 3742(e)(3). While there are no hard and fast rules to govern the extent of a departure, the Seventh Circuit has approved a method that involves calculating the defendant's sentence by analogy to existing guideline provisions. *Cruz–Guevara*, 209 F.3d at 648.

I found that a two level departure was reasonable in light of the goals of sentencing and the structure of the guidelines. Such a departure produced an imprisonment range of eighteen to twenty-four months, substantial punishment for a forty-eight year old father of minor children with no record. I also found that a two-level departure comported with the guidelines because it reasonably accounted for the over-statement of the seriousness of the conduct without unduly depreciating its severity. The most appropriate analogy to another guideline was to U.S.S.G. § 3B1.2, which allows for a two level re-

duction for minor role in the offense. I found that defendant's role in occasioning the loss was "minor" because he did not mastermind or fully understand the nature of the scheme, did not choose the amount taken, and did not significantly profit.[10] Further, in *Corry* the district court departed downward by two levels based on the factor present here, a reduction that the Seventh Circuit suggested was reasonable. *See* 206 F.3d at 751.

Defendant argued that because his gain was between $20,000 and $40,000 I should, in effect, use this figure as the loss amount and depart by five levels on the § 2F1.1 loss table. However, I concluded that using defendant's gain as a proxy for the actual amount of loss would not be consistent with the purpose of the guideline and would unduly depreciate the seriousness of the offense. I therefore departed by two levels. With the departure, defendant's adjusted offense level was fifteen, his criminal history category one, and the imprisonment range eighteen to twenty-four months. I thus sentenced defendant to eighteen months imprisonment.

### III. CONCLUSION

The guidelines were designed to promote uniformity in sentences in federal courts. They require district court judges to impose sentences within the prescribed range, but only if the case is a usual one. The Commission has specifically stated that the amount of loss, which essentially dictates the severity of the sentence in a fraud case, may at times overstate the seriousness of the defendant's conduct. This was just such a case.

ATC Leasing (more accurately its insurance company) suffered an actual loss here, and Bennett and Forchette must pay it back. But Forchette's conduct here was simply not what the Commission had in mind when setting the sentence for half a million dollar scam artists. Therefore, I departed downward and imposed a reasonable sentence consistent with the facts of the case.

---

**10.** There is nothing inconsistent with departing by analogy to this provision yet not providing a reduction directly under § 3B1.2. *Nachamie,* 121 F.Supp.2d at 297 n. 11; *see also United States v. Bierley,* 922 F.2d 1061, 1069 (3d Cir.1990) ("[W]hen an adjustment for Role in the Offense is not available by strict application of the Guideline language, the court has power to use analogic reasoning to depart from the Guidelines when the basis for departure is conduct similar to that encompassed in the Role in the Offense Guideline."). Because defendant was an "essential" part of the scheme a reduction under § 3B1.2 would not have been appropriate. *See Nachamie,* 121 F.Supp.2d at 297 n. 11; *see also United States v. Castillo,* 148 F.3d 770, 776 (7th Cir.1998) (holding that where defendant was an essential part of the scheme, the fact that other members of the criminal enterprise were more involved does not entitle him to a reduction under § 3B1.2). While defendant was essential to the scheme, his role in occasioning the *amount* of loss was, for the reasons discussed, limited.